UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                    )
                                    )
**RUTH TEAGUE,**                    )
                                    )
        **Plaintiff,** )
                                    )
    **v.**                         )
                                    )
                                    )  **Civil Action No. 13-10789-DJC**
                                    )
**MEGAN J. BRENNAN, Postmaster General,** )
**United States Postal Service,**   )
                                    )
        **Defendant.** )
                                    )
                                    )
_____ )

## MEMORANDUM AND ORDER

**CASPER, J.**                                                                                                                                                        **June 25, 2015**

**I.    Introduction**

Plaintiff Ruth Teague ("Teague") has filed this lawsuit against Defendant Postmaster General Megan Brennan ("Brennan"),[1] alleging discrimination in her employment as the Postmaster of the Groton, Massachusetts Post Office ("Groton Post Office") on the basis of gender, in violation of Title VII, 42 U.S.C. § 2000e et seq. (Count I), age, in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. ("ADEA") (Count II), and disability, in violation of the Rehabilitation Act, 29 U.S.C. § 701 et seq. (Count III).[2]  D. 1.  Furthermore,

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Postmaster General Megan Brennan, who assumed the role effective February 1, 2015, is substituted for the previous Postmaster General, Patrick Donahoe.  D. 39.

[2] Although Teague's complaint alleges a violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., federal employees claiming disability discrimination are covered by the Rehabilitation Act.  Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 11 n.1 (1st Cir. 2004).  The same standards apply to claims under either statute.  D. 26 at 1 n. 1 and cases cited.

she alleges she was retaliated against on the basis of her prior Equal Employment Opportunity ("EEO") complaints (Count IV). Id. Brennan has moved for summary judgment. D. 24. For the reasons stated below, the Court ALLOWS the motion.

## II.     Standard of Review

The Court grants summary judgment where there is no genuine dispute as to any material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law." Santiago–Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000). The movant bears the burden of demonstrating the absence of a genuine issue of material fact. Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000); see Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the movant meets its burden, the non-moving party may not rest on the allegations or denials in its pleadings, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986), but must come forward with specific admissible facts showing that there is a genuine issue for trial. Borges ex rel. S.M.B.W. v. Serrano–Isern, 605 F.3d 1, 5 (1st Cir. 2010). The Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009).

## III.    Factual Background

The following facts are undisputed and drawn from Brennan's statement of facts, D. 25, Teague's response, D. 33, and Brennan's response thereto, D. 36. Where noted, the Court cites relevant evidence in the record when facts are disputed yet clearly unsupported. See Rodio v. R.J. Reynolds Tobacco Co., 416 F. Supp. 2d 224, 227 (D. Mass. 2006) (deeming defendant's facts admitted where plaintiff disputed facts but failed to present supported facts that controverted assertions in defendant's statement of facts).

Teague began her employment with the United States Postal Service ("USPS") in 1979. D. 25 ¶ 1. She was the Postmaster of the Groton Post Office from 1993 until her retirement on July 31, 2012. Id. ¶ 2. This position was supervised by the central Massachusetts Post Office Operations Manager ("POOM"). Id. During the time of the alleged conduct in the complaint, Teague's POOM was Nicolas Francescucci ("Francescucci"). Id. ¶ 42. Francescucci knew Teague suffered from anxiety in the execution of her duties as it was discussed during the first meeting after he assumed the POOM position. Id. ¶ 47.

In 1994, Teague filed an administrative complaint alleging gender discrimination against her POOM at that time. Id. ¶ 7. She later withdrew the complaint. Id. In 1996 and 1997, Teague filed three EEO complaints alleging discrimination on the basis of her gender, age and disability (anxiety and panic attacks) by her then-POOM and another supervisor, on the basis of her failure to be selected as a Quality Consultant at USPS headquarters. Id. ¶ 8. These complaints were settled in 1998 while still pending. Id. In 2006, Teague filed an administrative complaint alleging gender, age, disability discrimination and retaliation. Id. ¶ 9. The complaint resulted in a lawsuit, which was resolved in 2009 at summary judgment in favor of the defendant. Id.

When Francescucci assumed the position of Central Massachusetts POOM in the fall 2011, he met with Teague and stated "I'm going to be your new POOM. I hope I am not going to have problems with you." D. 33 ¶ 7 (Teague's further statement of facts). Teague asked what Francescucci meant and he responded, "Because everybody knows all about you." Id. Teague asked whether he was referencing her prior EEO cases and her anxiety, to which he responded again, "I hope I don't have problems with you." Id.

In February 2012, Francescucci telephoned the Groton Post Office several times shortly after 8 a.m. in an attempt to reach Teague, but she had not yet arrived. D. 25 ¶ 14. The parties dispute whether Teague previously indicated to Francescucci whether she had adjusted her start time to 8:30 a.m. Id.; D. 36 ¶¶ 8-9 (Brennan's response to Teague's further statement of facts). Later that month, he called at approximately 8:25 or 8:30 a.m. as Teague pulled into the parking lot of the Groton Post Office. D. 25 ¶ 14. Francescucci yelled and screamed at Teague, told her that her shift was 8 a.m. to 5 p.m., and asked why she was late. D. 33 ¶ 11 (Teague's further statement of facts). Teague told him that her hours were actually 8:30 a.m. to 5:30 p.m. because she needed to care for her grandchildren. Id. Following this call, the two agreed to these hours and also that Teague should try to work 8 a.m. to 5 p.m. when possible. Id.

Also at some point in February 2012, Francescucci called the Groton Post Office at midday and was unable to reach Teague because she was out of the office delivering Express Mail. D. 25 ¶ 15. Teague returned to the office and called Francescucci, at which point he yelled at her and instructed her to assign the delivery of Express Mail to a clerk or a carrier so she could remain in the office. Id. Teague delivered Express Mail at midday approximately twenty to twenty-five times after this conversation when none of her carriers had returned from their routes. Id. ¶ 16. Following the conversations about hours and Express Mail delivery, Francescucci called the Post Office before 8:30 a.m. and at midday approximately twenty times. Id. ¶ 17.

On May 2, 2012 at 12:57 p.m., Teague emailed Peter Clarke ("Clarke"), a USPS marketing employee, and Wanda Santos-Dwyer ("Santos-Dwyer"), his supervisor, concerning a new USPS program, Every Door Direct Mail ("EDDM"), overseen by Clarke. Id. ¶ 18. Teague requested clarification about the proper EDDM procedure "asap" because a customer was

4

waiting for a response. Id. ¶ 19. Clarke responded at 3:25 p.m., indicated that the delay in his response was due to his conducting a mandatory training on the EDDM program, and provided clarification about the procedure. Id. ¶ 20. Teague and Clarke had further correspondence in which Teague complained about the confusing changes in procedures and lack of communication about same to the postmasters. Id. ¶¶ 21, 22. Santos-Dwyer later forwarded the emails with the text "She's back . . ." to Francescucci's manager, Barry Begley ("Begley"). Id. ¶ 23.

Begley forwarded the email chain to Francescucci, who the following day forwarded the chain to Santos-Dwyer, Clarke and Teague, copying Begley. Id. ¶ 24. Francescucci apologized to Santos-Dwyer and Clarke "who work hard to deal with such non sense [sic]," and stated that Teague's email was "disrespectful and unnecessary" because Clarke was communicating with postal staff to address EDDM concerns, and that, therefore, "[i]f there is a communication problem perhaps it [is] you." Id. (second alteration in original). He referred to Teague's comments as "uncalled [for] and off target" and stated he would meet with her personally to review the matter. Id. After sending the email, Francescucci called Teague on her cell phone and yelled at her for two minutes and forty-one seconds. Id. ¶ 25. At the time, Teague was in her car returning after delivering an Express Mail package. Id. When she returned to the Post Office and read Francescucci's email, she asked a clerk to transport her to the emergency room where she was diagnosed with a panic attack. Id. The emergency room physician recommended that Teague take the following day off, Friday, May 4th, and return to work on Monday, May 7th. Id. ¶ 27. On Monday, Teague visited her primary care physician who recommended she return to work the following day, which she did. Id.

On Tuesday, May 8th, Teague filed a worker's compensation claim for the May 3rd incident, which was thereafter denied. Id. ¶ 28. That same day Francescucci scheduled a Pre-

5

Disciplinary Interview with Teague and a representative of her union to discuss her hours. Id. ¶ 29. After Francescucci scheduled this meeting, Teague forwarded the email chain to the supervisor of Francescucci's supervisor, Charles Lynch. Id. ¶ 30. She wrote that Francescucci's May 3rd email "publically chastised [her] and ridiculed [her]" to the email's recipients and that Francescucci's behavior had created a hostile work environment, although she did not specify on what basis. Id.

On June 1, Francescucci called the Groton Post Office at 8:50 a.m. Id. ¶ 31. A clerk told him that Teague had not yet arrived and Francescucci emailed her at 8:55 a.m. requesting an explanation. Id. Upon her return, Teague replied she had been making purchases for the office. Id. Although Teague later claimed she was at work prior to leaving to purchase the items, she did not mention this in her response to Francescucci. Id. After she responded via email, Francescucci called her and proceeded to "dicker with [her] about the whole thing." D. 33 ¶ 24 (alteration in original) (Teague's further statement of facts).

On June 12 at 5:12 p.m., Teague emailed Francescucci about a problem in the office, to which he replied "call me" at 5:22 p.m. D. 25 ¶ 32. The following morning Teague responded, indicating she did not check her email because the problem was resolved "about 5:30 and then I left." Id. ¶ 33. Francescucci replied "I called at 5:15 and you were not there?" Id. Teague replied that there were three individuals in the office and none of them heard the phone ring. Id. Francescucci replied that he "was in contact with your office at 5:19 p.m. yesterday and you had left for the day." Id. Teague replied and accused Francescucci of altering the time stamp on her emails as his reply indicated she sent the first email at 2:11 p.m. as opposed to 5:12 p.m. Id. ¶ 34. Francescucci denied doing so, apologized if Teague felt he was harassing her and said he only called when he had a reason to do so, not to check on her attendance. Id. Teague contacted

an EEO counselor to begin the complaint process for the instant lawsuit the following day, June 13, 2012. Id. ¶ 10.

Based on her interactions with Francescucci, Teague decided to retire after the May 3, 2012 panic attack and accepted a $20,000 early retirement package. Id. ¶¶ 38-39. Her retirement was effective July 31, 2012. Id. ¶ 41.

## IV. Procedural History

Teague instituted this action on April 5, 2013. D. 1. Brennan has now moved for summary judgment. D. 24. The Court heard the parties on the pending motion and took the matter under advisement. D. 38.

## V. Discussion

At the outset, the Court notes Teague's complaint alleges a hostile work environment and constructive discharge based on gender (Count I), age (Count II), disability (Count III) and both a retaliatory hostile work environment and retaliatory constructive discharge (Count IV). D. 1. As Teague does not specify under which law her retaliation claim proceeds, the Court will consider it under all those previously mentioned. For the reasons stated below, Brennan is entitled to summary judgment.

### A. Hostile Work Environment

A hostile work environment exists when "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Noviello v. City of Boston, 398 F.3d 76, 84 (1st Cir. 2005) (citation and internal quotation marks omitted) (applying standard to Title VII claim); Collazo v. Nicholson, 535 F.3d 41, 44 (1st Cir. 2008) (applying standard to ADEA claim); Quiles-Quiles v. Henderson, 439 F.3d 1, 7 (1st Cir. 2006) (applying

7

standard to Rehabilitation Act claim). At this stage, Teague's claims are evaluated under the familiar McDonnell Douglas burden-shifting framework. Bhatti v. Trs. of Boston Univ., 659 F.3d 64, 70 (1st Cir. 2011).

To make a prima facie case, Teague must establish that: "(1) she is a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based upon [the protected characteristic]; (4) the harassment was sufficiently severe or pervasive that it altered the conditions of her employment and created an abusive working environment; (5) the offending conduct was both objectively and subjectively offensive; and (6) some basis for employer liability has been established." Tuli v. Brigham & Women's Hosp., 656 F.3d 33, 39 (1st Cir. 2011) (citation omitted) (Title VII); Collazo, 535 F.3d at 44 (ADEA); McDonough v. Donahoe, 673 F.3d 41, 46 (1st Cir. 2012) (Rehabilitation Act). Whether a workplace is hostile must be considered based on the totality of the evidence, and while "[t]here is no mathematically precise test," "several factors, none of which are individually determinative, are relevant: the severity of the conduct, its frequency, whether it is physically threatening or not, and whether it interfered with the victim's work performance." Gerald v. Univ. of Puerto Rico, 707 F.3d 7, 18 (1st Cir. 2013) (citing Bhatti, 659 F.3d at 73-74).

Brennan contends there is no issue of material fact as to whether Francescucci's harassment was motivated by discriminatory intent and further that there is no issue of material fact as to whether Teague's treatment was sufficiently severe as to constitute an abusive work environment. D. 26 at 11.

Teague bases the conclusion that her treatment was sufficiently severe on the following: a phone call in February 2012 in which Francescucci yelled at Teague concerning her hours, D. 33 ¶ 11 (Teague's further statement of facts); another phone call later that month in which he

8

yelled at her concerning the delivery of Express Mail, id. ¶ 13; twenty phone calls concerning her hours during the four-month period between February 2012 and Teague's decision to retire on May 8, 2012, id. ¶ 14; an email in May 2012 in which Francescucci referred to an email Teague sent to other USPS employees as "disrespectful," "unnecessary," "uncalled for" and "off target," id. ¶ 17; a phone call the following day during which he yelled at Teague for a number of minutes based on the aforementioned email, id. ¶ 18; a failure of Francescucci's supervisor to respond to Teague's email alleging a hostile work environment following this exchange with Francescucci, D. 36 ¶ 22 (Brennan's response to Teague's further statement of facts) (admitting a failure to respond but arguing that Teague did not allege a hostile work environment based on gender, age or alleged disability); a phone call in June in which Francescucci "dicker[ed]" with her concerning an absence from the office that morning, id. ¶ 24 (admitting but contending Teague's absence was not legitimate); and finally the disputed fact that Francescucci tampered with time stamps on Teague's emails to demonstrate that Teague had been out of the office on one occasion. Id. ¶ 27 (admitting the time stamp itself but contending the error was a computer glitch).

As to severity, the most severe conduct is the May 8th phone call during which Francescucci yelled at Teague for two minutes and forty-one seconds. D. 33 ¶ 18 (Teague's further statement of facts). As to frequency, Francescucci yelled at Teague twice in February and once in May and called her approximately twenty to twenty-five times over the course of several months beginning in February. Id. ¶¶ 11, 13, 14, 18. He also argued with her concerning her absence from the office in June, and Teague alleges he altered an email exchange to indicate she left work early. Id. ¶¶ 24, 27. Teague does not allege physically threatening conduct by Francescucci, although she suffered a panic attack which caused her to be admitted to the

hospital where her blood pressure was recorded as 187 over 122, leading her to take two days off work. Id. ¶¶ 18-19. Considering the all of the alleged incidents and the totality of the evidence, the Court cannot conclude there is a triable issue of fact as to whether Teague was subjected to a hostile work environment. See Colón-Fontánez v. Municipality of San Juan, 660 F.3d 17, 44-45 (1st Cir. 2011) (affirming summary judgment because "[t]he incidents described are episodic, but not frequent, in nature; upsetting, but not severe; mildly humiliating, but not physically threatening"). The undisputed conduct here was at most episodic, related to workplace responsibilities and Teague's work schedule. They cannot reasonably be called severe or threatening. The cases cited by Teague are inapposite as they all indicate behavior by supervisors that unquestionably interfered with the plaintiff's ability to perform his or her work. In Aviles-Martinez v. Monroig, 963 F.2d 2, 6 (1st. Cir. 1992), which is a constructive discharge case and not a hostile work environment case, the First Circuit overturned summary judgment for an employer because the plaintiff's supervisor removed all of plaintiff's files but then chastised him for not performing his work and also "scolded and ridiculed" plaintiff in front of clients "almost on a daily basis," conduct which is not present here. In O'Rourke v. City of Providence, 235 F.3d 713, 729 (1st. Cir. 2001), the First Circuit found no error in verdict finding hostile work environment based in part upon repeated and extensive sexually charged work sabotage, also not present on the record before the Court. Teague points to the panic attack she suffered on May 3rd, which caused her to visit the emergency room where a physician noted that her blood pressure, 187 over 122, was life threatening. D. 33 ¶ 19 (Teague's further statement of facts). Certainly, two and a half minutes of admonishment by one's supervisor is upsetting. However, to constitute a hostile work environment, the "environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that

the victim in fact did perceive to be so," and "isolated incidents (unless extremely serious)" are insufficient. Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998) (explaining that Title VII does not create a "general civility code"). Here, although Teague explains her treatment was subjectively offensive, phone calls concerning her failure to adhere to particular hours and the email and phone call precipitated by her email to higher-ups finding fault with a program for which she failed to attend a mandatory training the very day of her complaints cannot be considered objectively abusive to the degree necessary to proceed. Therefore, there is no issue of material fact as to whether Teague suffered "intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." Noviello, 398 F.3d at 84.

Additionally, Teague has failed to point to specific, admissible evidence to rebut Brennan's showing that no reasonable factfinder could find Francescucci's treatment was because of Teague's gender, age or disability. It is undisputed that Francescucci was aware of Teague's prior EEO complaints, but there is no evidence of even any allusion thereto by the supervisor beyond his introductory conversation. Approximately six months after his arrival as Teague's POOM, it is undisputed that Francescucci contacted Teague repeatedly concerning her hours and Teague was reprimanded for the nature and tone of her complaints about the EDDM to the program's coordinator. Even if, as Teague alleges, Francescucci told her that "people think you're crazy," D. 33-1 at 21-22, it is unclear how such comment is reflective of adverse treatment because of her gender, age or disability (i.e., anxiety). The same is true of Santos-Dwyer's statement "she's back . . . " on the heels of Teague's interaction with Clarke about the EDDM program.

Teague's prior supervisors' use of the term "EEO bitch complainer" to refer to her, which she imputes without cause to Francescucci, D. 34 at 5, does not indicate his conduct was because of her protected status, because "regardless of the evidentiary course the plaintiff charts, she must show that alleged discriminatory conduct was not 'merely tinged' with remarks [concerning the protected characteristic] but actually was, in either character or substance, discrimination <u>because of</u> [the protected characteristic]." <u>Rivera v. Puerto Rico Aqueduct & Sewers Auth.</u>, 331 F.3d 183, 189 (1st Cir. 2003) (quoting <u>Oncale v. Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75, 81 (1998)). Teague cannot rebut Brennan's evidence that Teague's treatment was not because of her protected status, but because of her work performance including the repeated difficulty concerning her hours and the email to the EDDM manager. Teague imputes the mindset of previous supervisors onto Francescucci based on the fact that he was "buddy buddy" with them. D. 28-1 at 31. Thus, she alleges that when he came to her office following his arrival as POOM and said "I hope I am not going to have problems with you," he was acting "consistent with [the] underlying belief" of her previous supervisors. D. 34 at 5. Her basis for this conclusion is Francescucci's friendship with the men, as stated above, and the following statement, "everybody knows all about you," coupled with his response to her inquiry as to whether this concerned her prior EEO complaints and anxiety, "I hope I don't have problems with you." <u>Id.</u> However, the record reveals that Francescucci had a strict approach to hours, as evidenced by his November 2011 email to all the Postmasters shortly after he became POOM for the area. D. 27-1 at 2-3. There is nothing to rebut Brennan's evidence indicating Francescucci advised his postmasters to keep certain hours and that Teague had repeated difficulty doing so.

Teague does not recall Francescucci using gender specific language or slurs, either regarding Teague or overheard as applied to other women. D. 28-1 at 31. When asked whether

12

she was "the only one that he was picking on" of the ninety-two postmasters in the Central Massachusetts area that Francescucci supervised, Teague testified affirmatively but when asked why she thought that was the case, she responded "I don't know." Id. at 23-24. When asked whether she had experienced discrimination based on her disability, she explained that there were rumors going around concerning her anxiety and panic attacks, and specifically that Francescucci said "people think you're crazy" during the phone call in which he admonished her for her email concerning the EDDM system. D. 33-1 at 21-22. She further points to his reply, copying his supervisors, in which he referred to her original email as "nonsense." Id. Yet this evidence, standing alone, is insufficient to determine Francescucci was motivated by Teague's disabled status.

Nor has Teague presented sufficient evidence from which to conclude that similarly-situated workers not in her protected class were treated less harshly. D. 34 at 9-10. As to comparably situated women, Teague does not offer any specific facts to rebut Brennan's legitimate reason for Teague's treatment or otherwise indicate Francescucci subjected women to harassment based on their gender or association with disabled individuals. Teague was asked "is it your contention that [Francescucci] basically harasses or discriminates [against] moms with special needs kids who need some extra time in their schedule, more flexibility?" D. 28-1 at 31. She responded, "[y]ou can't actually say that per se," mentioned other women under Francescucci's supervision who care for disabled children and added, "can I say that it is because you're outspoken, or because you have children that you care for, it is a coincidence that all the ones that have problems with the POOMs are the ones that speak up." Id. at 32. Teague offers no evidence on the treatment these women experienced, and this is insufficient to establish discriminatory intent. As to similarly situated men, Teague points to Francescucci's meetings

13

with three male postmasters who were not subjected to pre-disciplinary interviews. D. 34 at 10. She, however, concedes that they too were required to attend a meeting with Francescucci concerning work hours but argues that her meeting was more severe because it required the presence of a union representative. Id. Yet when asked whether she actually received any discipline, she answered "[n]ot that I recall." D. 28-1 at 22.

Because the Court finds that there is no issue of material fact as to whether Teague suffered harassment on the basis of a protected characteristic, or that the harassment was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment, Brennan is entitled to summary judgment as to Teague's hostile work environment claims.

### B. Constructive Discharge

Constructive discharge occurs when "working conditions [are] so intolerable that a reasonable person would have felt compelled to resign." Pa. State Police v. Suders, 542 U.S. 129, 147 (2004). This burden is greater than that required to sustain a hostile work environment claim, as plaintiff must have suffered "harassment so severe and oppressive that staying on the job while seeking redress—the rule save in exceptional cases—is intolerable." Gerald, 707 F.3d at 25 (quoting Lee-Crespo v. Schering-Plough Del Caribe, Inc., 354 F.3d 34, 45 (1st Cir. 2003)). "In other words, work conditions must have been so intolerable that [a plaintiff's] decision to resign was 'void of choice or free will'—that her only option was to quit." E.E.O.C. v. Kohl's Dep't Stores, Inc., 774 F.3d 127, 134 (1st Cir. 2014) (quoting Torrech-Hernández v. Gen. Elec. Co., 519 F.3d 41, 50 (1st Cir. 2008)). This is an objective standard, liability "cannot be triggered solely by the employee's subjective beliefs, no matter how sincerely held." Marrero v. Goya of Puerto Rico, Inc., 304 F.3d 7, 28 (1st Cir. 2002) (citation omitted).

Although the undisputed facts demonstrate that Francescucci did on occasion yell at Teague, they do not rise to the level required for Teague's claims to proceed. For the reasons discussed above, repeated phone calls concerning a failure to adhere to working hours and an email and phone call precipitated by Teague's complaints about the EDDM program, D. 25 ¶ 22, cannot be considered sufficiently hostile or abusive to establish a hostile working environment, let alone a constructive discharge. See Marrero, 304 F.3d at 28 (citation omitted) (providing, "[t]o prove constructive discharge, the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment"); Ahern v. Shinseki, 629 F.3d 49, 59 (1st Cir. 2010) (emphasis in original) (affirming summary judgment to employer on constructive discharge claim when supervisor's "conduct may have engendered a nerve-wracking environment, but not a nerve-wracking environment *based on gender*"). Here, where Teague's hostile work environment claim is insufficient, her constructive discharge claims also fails. See Pa. State Police, 542 U.S. at 149 (providing, "[c]reation of a hostile work environment is a necessary predicate to a hostile-environment constructive discharge case").

### C. Retaliation

A claim of retaliation requires that Teague engaged in a protected activity, that she suffered a materially adverse action and that the action was causally linked to the protected activity. Dixon v. Int'l Bhd. of Police Officers, 504 F.3d 73, 81 (1st Cir. 2007) (applying standard to Title VII claim); Mesnick v. Gen. Elec. Co., 950 F.2d 816, 827 (1st Cir. 1991) (applying standard to ADEA claim); Quiles-Quiles, 439 F.3d at 8 (applying standard to Rehabilitation Act claim). Similarly to the analysis above, the claim is analyzed under the framework set forth in McDonnell Douglas. Alvarado v. Donahoe, 687 F.3d 453, 458-59 (1st

Cir. 2012). That "a series of minor retaliatory actions may, when considered in the aggregate, satisfy the McDonnell Douglas prima facie 'adverse action' requirement, is settled law in this Circuit." Id. To survive summary judgment, Teague must show that the actions alleged "furnished a sufficient basis to ground a finding that a hostile work environment actually existed." Noviello, 398 F.3d at 88 (1st Cir. 2005). "[A]ny abuse must be both objectively offensive (as viewed from a reasonable person's perspective) and subjectively so (as perceived by the plaintiff)." Alvarado, 687 F.3d at 461 (citation omitted).

Here, the parties do not dispute that Teague's prior complaints constitute protected activity. D. 25 ¶¶ 7-9. Where they differ, however, is whether she suffered a materially adverse action and whether it was casually linked to the protected activity. Teague argues she was subjected to a retaliatory hostile work environment, D. 34 at 14. She, however, cannot make out a prima facie case for such claim, since no reasonable factfinder could find a causal connection for her protected action and the alleged circumstances giving rise to her hostile work environment claim. To succeed on a retaliation claim based on remote protected activity, as is the case here given that her last, previous complaint occurred in 2006, more than five years prior to the alleged hostile work environment as alleged in the complaint, Teague must proffer sufficient evidence upon which a reasonable jury could conclude that the protected activity is part of a larger context linking it to the retaliatory action. In Muñoz v. Sociedad Española De Auxilio Mutuo y Beneficiencia De Puerto Rico, 671 F.3d 49, 56 (1st Cir. 2012), the First Circuit considered whether a five-year lapse between protected activity and a plaintiff's termination could support a jury's finding of retaliation under the ADEA. The court provided that, standing alone, the termination was "too remote to establish causality" but explained that additional evidence offered by the plaintiff supported a finding of retaliation, namely, that during the

relevant period the plaintiff was disciplined for common conduct while similarly-situated individuals were not, that he had an "impeccable reputation earned over more than two decades," and that the original statement made five years ago, that he "would no longer be allowed to work either in that hospital or in any other hospital in Puerto Rico" was made by an individual who was "part of the collective that ultimately carried out the threat" to terminate him. Id. at 56-57. Noting the plaintiff's testimony concerning "a record of hostility" which became worse each month was vague, the court nevertheless found the evidence could support a "total package" of retaliation and determined the jury's finding of liability was supported by the evidence. Id. at 57.

Here, Teague filed her complaints in 2006. She has not offered evidence of any specific conduct between 2006, when she filed her EEO complaint, and 2011, when Francescucci became her supervisor. Teague focuses the Court's attention to the conversation shortly after Francescucci became POOM in Fall 2011 in which Teague alluded to her prior EEO complaints and her anxiety and he reiterated that he hoped he would not have problems with her. D. 33 ¶ 7 (Teague's further statement of facts). Teague argues "[i]mmediately thereafter, Mr. Francescucci commenced his harassing treatment toward Ms. Teague which went unrelenting until her retirement effective July 31, 2012." D. 34 at 15.

The only link that Teague can draw between this expressed hope by her supervisor and her treatment is a temporal one. Although Teague argues "this demonstrates a causal connection between Ms. Teague's protected conduct and the adverse action to which she was subjected," id., standing alone, the Court cannot conclude that Teague has produced sufficient facts to the evidence proffered by Brennan that Francescucci was acting pursuant to his role as her manager, particularly given there was no further reference of the EEO complaints at any point after the aforementioned conversation. That is, even assuming arguendo that Teague made out her prima

17

facie case for a retaliatory hostile work environment claim, Brennan has articulated a legitimate reason for Francescucci's conduct—namely, Teague's failure to adhere to Francescucci's expectations concerning her schedule and her "disrespectful and unnecessary" communications with Clarke about the EDDM program. D. 25 ¶ 24. This reason has not been rebutted by Teague as pretext for retaliatory intent where the statement is too remote from the allegedly adverse action absent connecting evidence to support a finding of retaliation. See Pearson v. Mass. Bay Transp. Auth., 723 F.3d 36, 42-43 (1st Cir. 2013) (affirming summary judgment for employer when plaintiff offered a letter threatening to fire him a year after plaintiff engaged in protected conduct, because "[m]ore than a year separated these events, and Coleman had a legitimate reason for writing the letter: [the plaintiff] had failed to show up for a mandatory appointment"); Dressler v. Daniel, 315 F.3d 75, 80 (1st Cir. 2003) (affirming summary judgment and agreeing with the district court that "no reasonable trier of fact could conclude, by a preponderance of the evidence, that the 1999 complaints to the police were caused by the 1997 sexual harassment charge," and further offering that the record suggested intervening events were the cause of the allegedly retaliatory conduct). The Court concludes there is no genuine issue of material fact as to whether Teague has suffered retaliation based on this evidence and therefore must grant summary judgment to Brennan as to the retaliation claim.

## VI. Conclusion

For the foregoing reasons, the Court ALLOWS Brennan's motion for summary judgment, D. 24.

**So Ordered.**

                                                    /s/ Denise J. Casper
                                                   United States District Judge